Polk, Prober & Raphael, A Law Corporation
Michael S. Polk, Esquire, #67161
Dean Prober, Esquire, #106207
Lee S. Raphael, Esquire, #180030
P.O. Box 4365
Woodland Hills, CA 91365-4365
(818) 227-0100
O.017-003
Attorneys for Defendants JAY DEE SHIVERDAKER,
JOINT VENTURE PARTNERS INTERNATIONAL, INC.
OLD CANAL FINANCIAL CORPORATION AND GLOBAL
FORECLOSURE CORPORATION

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>WILLIAM AMES AND HELGA AMES,<br><br>Debtor. | Bk. No. 05-55159-MM-11<br><br>Adversary Proc. No. 05-5635-MM<br><br>Chapter 11 |
| WILLIAMS AMES and HELGA AMES,<br><br>TO Plaintiffs,<br><br>JAY DEE SHIVERDAKER, trustee and as an individual; JOINT VENTURE PARTNERS INTERNATIONAL, INC., a Nevada corporation; OLD CANAL FINANCIAL CORPORATION, a California corporation; GLOBAL FORECLOSURE CORPORATION, A California corporation,<br><br>Defendants. | MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION; DECLARATION OF JAY DEE SHIVERDAKER; DECLARATION OF MICHAEL S. POLK<br><br>Date: March 30, 2006<br>Time: 10:30 a.m.<br>Courtroom: 3070<br>Judge: Marilyn Morgan<br>Action Filed: December 20, 2005<br>Trial Date: None |

Comes now Jay Dee Shiverdaker ("Shiverdaker"), Joint Venture Partners International, Inc ("JVP"), Old Canal Financial Corporation ("Old Canal") and Global Foreclosure Corporation ("Global"), referred to collectively herein as "Defendants", and hereby

submit this Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction and the attached Declarations of Jay Dee Shiverdaker, and Michael S. Polk in support thereof.

## I. FACTUAL BACKGROUND

Plaintiffs improperly seek to impose a preliminary injunction to circumvent the legitimate rights of Old Canal to perfect their security interest in real property generally described as 6545 Sloping Meadow Court, San Jose, CA ("Property") herein). On February 22, 2006, this Court granted Old Canal relief from the Automatic Stay with respect to its secured lien encumbering the Property. Plaintiffs' Motion for Temporary Restraining Order was granted on March 2, 2006.

### A. Relationship of Plaintiff William Ames to Shiverdaker

JVP was incorporated, as a Nevada corporation on August 13, 1993 and qualified to do business in California on September 3, 1998. Shiverdaker was the founder and President of JVP and has remained as the President through this date. JVP offers its clients investment banking, corporate financing and management consulting advise. Additional, related client services provided by JVP include financial and business planning and investigation of potential private corporate funding for its business clients. (See Declaration of Shiverdaker, ¶4)[1]

On or about October 12, 2001, Scott Cleveland, Vice President of Sales for Ames' company, Gobosh, Inc. ("Gobosh" herein) set up a meeting between Shiverdaker and William Ames, the majority shareholder and officer in Gobosh. The purpose of this meeting was to explore possible turnaround strategies and/or assistance JVP could provide relating to Gobosh operations. Gobosh filed a Chapter 11 bankruptcy proceeding on or about September 2001. (See D. Shiverdaker, ¶6).

Shiverdaker was told that Gobosh had filed bankruptcy to avoid eviction problems (See D. Shiverdaker, ¶6). Shiverdaker suggested that JVP should plan and conduct an intensive

---

[1] "D. Shiverdaker" and "¶" means and refers hereinafter to the attached Declaration of Jay Dee Shiverdaker and the pertinent Paragraph thereof.

financial planning conference with senior Gobosh senior staff members. William Ames agreed that the JVP planning conference would be helpful (See D. Shiverdaker, ¶6).

A copy of the Engagement Letter and Retainer Agreement-Intensive Business Planning, dated October 16, 2001 between Gobosh, Inc. and JVP is attached to the Declaration of Shiverdaker, marked Exhibit "A' and incorporated herein. The fee to JVP of $5,000.00 was paid up front. (See D. Shiverdaker, ¶6).

After completion of the Intensive Business Planning, William Ames, as **both an individual and President/CEO of Gobosh**, executed that certain Engagement & Retainer Agreement, dated November 6, 2001, ("Retainer Agreement" herein), with JVP. A copy of said Agreement is attached to the Declaration of Shiverdaker, marked Exhibit "B" and incorporated herein. As set forth in the Agreement, JVP was to render the following services:

> " JVP will provide investment banking, corporate finance and turnaround/reorganization assistance, consultation and advisory services for Client as represented by this Engagement Letter and Retainer Agreement, (the "**Agreement**")

The Retainer Agreement also provides that JVP would be compensated for its services as follows:

> "**FEES, EXPENSES, RETAINER & EQUITY**: We charge fees for or services and we are reimbursed for our expense as outlined in this Agreement. We will accrue professional and administrative support personnel charges against your project(s) based upon the total actual time sent on any particular matter by the professionals and administrative support staff at JVP. Administrative support personnel are engaged by our firm who are not professionals, but who may perform some of the more routine work under the direct supervision of specific professionals.
> **Standard Fees:** Our standard billing rates for professionals currently vary from one-hundred fifty dollars ($150) per hour to three-hundred fifty dollars )$350) per hour, depending upon the expertise of the professional performing the task. Our billing rates for administrative support currently vary from Seventy-five ($75) per hour to ninety-five ($95) per hour.
> **Billable & Deferred Fees:** To assist Client in managing its

> turnaround effort, future financing and corporate development costs, JVP is prepared to adjust its Standard Fees to $150 per hour for professionals and $75 per hour for administrative personnel (the **"Billable Fees"**). The balance of our Standard Professional and administrative Fees will be deferred, referred to herein as the Outstanding Deferred & Billable Balance (the "**Balance"**), until the conclusion of a specific Project, a defined milestone, outside financing, or the termination of our business relationship, as defined below, whichever occurs first.
> Personnel charges will be accrued and billed in one-half hour increments, including travel time, with a minimum of one-half day segments (four hours) plus hourly billing thereafter for professonal and/or administrative personnel, who travel on behlf of Client."

JVP would employ outside consultants and independent contractors to assist in fulfilling the employment responsibilities of JVP to Ames and Gobosh. JVP would incorporate those outside consultants in the billing to William Ames (See D. Shiverdaker, ¶8)

JVP billing statements were personally handed to William Ames by Shiverdaker on a monthly basis until William Ames began getting behind on payments in March 2002. (See D. Shiverdaker, ¶9). Thereafter, Shiverdaker would submit billings every two (2) weeks. (See D. Shiverdaker, ¶9).

All significant findings and suggestions regarding Gobosh and William Ames financial operations were conveyed via personal meetings between William Ames and Shiverdaker or in email/memoranda. (See D. Shiverdaker, ¶10).

As of November 6, 2001, JVP's areas of responsibilities were defined as management, marketing advisory consultation and assisting in investor financing. However the majority of JVP's time was spent on analyzing pending collection litigation /claims, liaison activities with numerous attorneys regarding collection actions or claims against William Ames and/or Gobosh, Inc, investigation of possible embezzlement claims against former Gobosh employees, investigation of claims against Gobosh vendors and handling personnel issues for William Ames. (See D. Shiverdaker, ¶11).

After the Chapter 7 conversion of Gobosh, Inc., in mid May 2002, JVP primarily

dealt with advising and assisting William Ames, on **a significant number of** litigation matters involving Ames and/or items which William Ames required JVP assistance. (See D. Shiverdaker, ¶12).

**B. <u>Genesis of the JVP Note and Trust Deed.</u>**

As of May 31, 2002, William Ames owed JVP approximately $331,962.38 in outstanding billings, current billings and deferred delinquent billings (per the Retainer Agreement) from January 31, 2002 through May 31, 2002. William Ames has an incorrect memory of the extent of his delinquency on the JVP billings. (See D. Shiverdaker, ¶13).

Copies of the billings of JVP to William Ames over the period of November 1, 2001 through May 31, 2005 are attached to the Declaration of Shiverdaker, marked Exhibit "C" and incorporated herein by reference. (See D. Shiverdaker, ¶13).

During the period of November 2001 through May 15, 2002, Shiverdaker and other JVP independent contractors and outside consultants met with Williams Ames on substantially a daily basis to review the status and strategy regarding the various litigation, collection, marketing and financial projects assigned to JVP. (See D. Shiverdaker, ¶14). As noted in Shiverdaker's Declaration, JVP did everything assigned to JVP in an attempt to keep William Ames "out of trouble".

At no point in time during JVP's employment did William Ames voice any dissatisfaction with the services of Shiverdaker. This is in direct contradiction to William Ames' claims in Plaintiffs' Complaint. (See D. Shiverdaker, ¶15).

In April 2002, Shiverdaker indicated to William Ames that he was seriously delinquent on payment to JVP and that JVP could not continue to offer its services without being paid. Shiverdaker explained that in order to complete several remaining projects, future payment must be secured in some fashion. (See D. Shiverdaker, ¶16). William Ames and Shiverdaker agreed that in order to insure payment on past due billings and future billings, he and his wife would execute a Note and Trust Deed in favor of JVP and in the amount of $600,00.00.

Attorney, Ron Coleman, prepared the Note and Trust Deed which would represent the amount due JVP as of May 14, 2002 plus the anticipated fees to JVP for additional work over the two (2) year period of the Note. (See D. Shiverdaker, ¶16). In exchange for the security of the Note and Trust Deed, Shiverdaker agreed to "cap" the additional fees for remaining projects at approximately $268,000.00 – being the difference between the approximate $332,000.00 and $600,000.00. ( See D. Shiverdaker, ¶18)

There was never any discussions between Shiverdaker, William Ames, Helga Ames and/or Ron Coleman regarding a scheme to encumber the subject Property to avoid the personal guarantees of Plaintiffs. There never was any discussion with Shiverdaker about the Note and Trust Deed being vehicles to avoid Plaintiffs' personal guarantee obligations. Shiverdaker never agreed that the Note and Trust Deed would be reconveyed by JVP upon the request of William Ames. (See D. Shiverdaker, ¶17). In fact the aggregate unpaid billings by JVP did wind up exceeding the $600,000.00 "cap". (See D. Shiverdaker, ¶18).

Neither Shiverdaker nor any companies in which he had an ownership interest has ever filed bankruptcy. Shiverdaker never employed a strategy to encumber his personal property to avoid personal guarantee obligations. (See D. Shiverdaker, ¶17).

Shiverdaker was the person responsible at JVP for all billings to William Ames. (See D. Shiverdaker, ¶9). All billings reflect an itemization of the services rendered b JVP to William Ames. ( See D. Shiverdaker, ¶11) and Exhibit "C' attached thereto)

C. **JVP Sale of The Note and Trust Deed.**

On September 1, 2004, Shiverdaker met with William Ames at Wells Fargo Bank regarding a possible project with American Medical Revenue. Shiverdaker told William Ames that the Note obligations were seriously past due and that unless JVP was paid the Note would be sold. (See D. Shiverdaker, ¶19). Shiverdaker also reiterated to Williams Ames that "Ames could always go back to Germany and get money necessary to pay off his obligations from the substantial funds Ames had told Shiverdaker he had deposited off shore." (See D. Shiverdaker,

¶19) In a heated exchange William Ames told Shiverdaker that "nobody is going to get paid", "there is no money", " I am broke" and "I have been borrowing money from my childrens' trust funds to pay my bills." When Shiverdaker related that he was then going to be forced to sell the Note and Trust Deed, William Ames responded by saying "OK, I'll just file bankruptcy."

On or about April 13, 2005, Shiverdaker was informed that William Ames, through his attorney James Little, was attempting to claim that the Note and underlying Trust Deed should be cancelled and rescinded.

Between May 14, 2004 and April 13, 2005, JVP did not have any discussions whatsoever with William Ames regarding any forebearance arrangements or agreements to withhold enforcement with respect to the delinquent Note and Trust Deed obligation. (See D. Shiverdaker, ¶21)

In February 2005, Shiverdaker explored options to sell the subject Note and Trust Deed. In May 2005, Shiverdaker entered into discussions with Old Canal regarding the purchase of said Note and Trust Deed. (See D. Shiverdaker, ¶22) Other than the James Little letter of April 13, 2005, JVP and Shiverdaker were not aware of any pending or threatened action against them by William Ames and Helga Ames until JVP was served on or about June 5, 2005. (See D. Shiverdaker, ¶22)

JVP and Shiverdaker have no affiliation or relationships with Old Canal other than the fact that Old Canal purchased the subject Note and Trust Deed for valuable consideration on or about May 27, 2005. (See D. Shiverdaker, ¶23 and Exhibit "D" and "E" attached to the Declaration of Shiverdaker).

Old Canal was truly a bona fide purchaser of the Note and Trust Deed from JVP and Plaintiffs were informed of the sale on or about June 2,2005 by a letter from Ron Coleman to James Little. (See Shiverdaker, ¶24).

Old Canal initiated foreclosure proceedings on the Note and Trust Deed by filing its Notice of Default on or about June 20, 2005. A Trustee's Sale on said Trust Deed obligation

was to be set for on or about September 20, 2005 – approximately 30 days after the Plaintiffs'/Debtors' instant bankruptcy filing

On February 22, 2006, this Court granted Old Canal relief from the Automatic Stay to proceed with its foreclosure sale; however, a Temporary Restraining Order was issued by this Court on March 2, 2006 until hearing on Plaintiffs' application for a preliminary injunction.

## II. ARGUMENT

As is clearly indicated herein, Plaintiffs have failed in several significant respects to carry their burden to justify the imposition of the requested preliminary injunction. William Ames is no stranger to bankruptcy and the bankruptcy arena. The attached Declaration of Shiverdaker establishes that (i) the subject Note and Trust Deed were given in consideration for services rendered William Ames, (ii) the only person who may have orchestrated a scheme to avoid personal guarantee obligations was Plaintiff William Ames and (iii) the Note and Trust Deed were sold to Old Canal – a bona fide purchaser for value.

### A. Plaintiffs Fail to Demonstrate a Likelihood of Prevailing on the Merits

Plaintiffs seek the imposition of a preliminary injunction to restrain a pending foreclosure on the Note and Trust Deed currently owned by Old Canal. An injunction is generally defined as an **equitable** remedy. The Court must balance the respective equities of the parties and conclude that, pending a trial on the merits, the responding party should or should not be restrained from exercising a claimed right. Robbins v. Superior Court 38 Cal. 3d 199, 206, 211 Cal. Rptr. 398 (1985); Continental Baking v. Katz 68 Cal. 2d 512, 528, 67 Cal. Rptr 761 (1968)

In deciding whether or not to grant a preliminary injunction, courts must evaluate two factors. Common Cause v. Bord of Supervisors 49 Cal. 3d 432, 441-442, 261 Cal. Rptr. 574

(1989); Pleasant Hill Bayshore Disposal, Inc. v. Chip-It Recycling, Inc. 91 Cal.App. 4th 678, 695-696, 110 Cal. Rptr. 2d 708 (2001):

- The likelihood that the applicant will prevail on the merits at trial.
- The balance of any interim harm to the applicant if the injunction is denied compared with the harm to the responding party if the injunction is issued.

Under the former factor, the court must evaluate the possibility of success of a plaintiff on the merits of its case. Teachers Ins. & Annuity Assn. V. Furlotti 70 Cal.App. 4th 1487, 1493, 83 Cal.Rptr 2d 455 (1999).

A court may not grant a preliminary injunction regardless of harm unless there is a probability that a plaintiff would ultimately prevail on the merits of the claim. Hunt v. Superior Court 21 Cal. 4th 984, 999, 90 Cal.Rptr 2d 236 (1999).

The burden is on the Plaintiffs to show all the elements necessary to support the issuance of a preliminary injunction. The Court must find that, based upon declarations submitted by Plaintiffs and these Defendants, there is a likelihood that Plaintiffs will prevail in their adversary action to cancel or nullify the Note and Trust Deed voluntarily signed by Plaintiffs on May 14, 2002.

A court should not issue an injunction if there is no possibility of success even if issuing the injunction might prevent irreparable harm. Scates v. Rydingswood 229 Cal.App.3d 1085, 1096, 280 Cal. Appl. 3d 544 (1991). See also 14859 Moorpark Homeowner's Assn. V. VRT Corp. 63 Cal.App. 4th 1396, 1408, 74 Cal.Rptr. 2d 712 (1998); Perez v. Hastings College 45 Cal.App. 4th 453, 456-457, 53 Cal. Rptr. 2d 11 (1996).

This Court is the judge of the credibility of the affidavits or declarations filed in support of and in opposition to a preliminary injunction.

A preliminary injunction should not be granted when the verified Answer to the underlying Complaint and/or responsive Declarations explicitly and unequivocally deny the charging allegations.

The attached Declaration of Shiverdaker clearly, explicitly and unequivocally rebuts all the pertinent allegations of William Ames. Specifically, it appears that:

- Ames employed JVP to render needed services.
- Ames was severely delinquent on his payment obligations to JVP.
- Ames executed a Note and Trust Deed to secure ultimate payment of the JVP obligations.
- There never was any agreement between JVP and Plaintiffs for the reconveyance and/or cancellation of the Note and Trust Deed.
- Old Canal purchased the Note and Trust Deed and as a bona fide purchaser Old Canal is entitled to perfect its security rights in the encumbered real property.

This Court must seriously consider the substance of Plaintiffs' allegations. Why would the Note and Trust Deed be prepared in the first place? JVP was not being paid and would not consider continuing to render services to William Ames absent security for the payment of its fees. The two (2) year term of the Note coincided with the additional work and projects JVP was to undertake on behalf of Plaintiffs and William Ames. In fact, the total of all fees due JVP as of May 14, 2004 exceeded $600,000.00. (See D. Shiverdaker, ¶18).

There simply is no showing that Plaintiffs have any likelihood of prevailing on the merits of their underlying Complaint. The "story" proposed by Plaintiffs regarding a non-Note and a conspiracy to encumber he Property to avoid Ames' personal guarantee issues **is just that – <u>an unbelievable story.</u>**

In seeking a preliminary injunction, Plaintiffs bear the burden of demonstrating both likely success on the merits and occurrence of irreparable harm before a final judgment can

be entered. Savage v. Trammell Crow Co. 223 Cal.App. 3d 1562, 1571, 273 Cal.Rptr. 302 (1990).. A preliminary injunction may not issue in a doubtful case. Thayer Plymouth Center, Inc. v. Chrysler Motors Corp. 225 Cal.App. 2d 300, 305, 63 Cal.Rptr. 148 (1967). Absent a showing that there is a **reasonable probability** that Plaintiffs will succeed in their adversary action, this Court must deny the request for a preliminary injunction.

Plaintiffs have not and cannot provide a showing of reasonable probability of prevailing on the merits of their case. The denial of a preliminary injunction is proper when Plaintiffs' allegations are completely denied and substantial conflict in the evidence exists. London v. Marco 103 Cal.App.2d 450, 229 P. 2d 401 (1951)

The only relevant support for Plaintiffs' position that the Note and Trust Deed were fraudulently obtained comes from the verified Complaint and the Declaration of William Ames in Opposition to Motion for Relief from Automatic Stay. Where is the irrefutable evidence to support a finding of a reasonable probability of success on the merits?

Plaintiffs allege in Paragraph 8 of their Complaint that Shiverdaker proposed that the Note and Trust Deed be used to insulate Plaintiffs from personal guarantee exposure and that the Note and Trust Deed would be returned or reconveyed to Plaintiff at their request. As set forth hereinabove and in the attached Declaration of Shiverdaker those allegations are totally false. (See D. Shiverdaker, ¶25). Plaintiffs provide no other evidence or writings which support their conclusions.

Plaintiffs allege in Paragraph 9 of the Complaint that they were unaware of any sums due JVP. As set forth in the attached Declaration of Shiverdaker, substantial fees were owed JVP for services rendered Plaintiffs and in fact itemized billings clearly support Defendants' position that valuable consideration was given for the Note and Trust Deed. (See D.

Shiverdaker, ¶13).

Plaintiffs allege in Paragraph 11 of the Complaint that upon the request of Plaintiffs, JVP had agreed to cancel and return the Note and Trust Deed to Plaintiffs. Shiverdaker unequivocally denies the existence of any such agreement. (See D. Shiverdaker, ¶20). Not only is there a statute of frauds issue presented (as there is no writing evidencing such an agreement with respect to real property interests) but such an arrangement makes absolutely no sense in the context of an employer (Plaintiffs) and employee (JVP) relationship. JVP needed to be secure in the position that it would be paid by Plaintiffs or have the right to foreclose on the Trust Deed.

This Court must subject the allegations in Plaintiffs Complaint to the same test associated with oral testimony. Conclusionary statements regarding fraudulent representations, side oral agreements and unsupported allegations cannot support an application for injunction. A Complaint that is unsupported by affidavits and alleges general conclusions should not support injunctive relief. E.H Renzel Co. v Warehousemen's Union 16 Cal.2d 369, 373, 106 P.2d 1 (1940); Finnie v. Town of Tiburon 199 Cal.App.3d 1, 15, 244 Cal.Rptr. 581 (1988).

All of the charging allegations in Plaintiffs' Complaint which relate to the circumstances surrounding the execution of the Note and Trust Deed have been clearly rebutted by Shiverdaker. The Note and Trust Deed, attached to the Declaration of Shiverdaker as Exhibits "D" and "E" leave no doubt as their meanings. There are no agreements to cancel or reconvey contained therein nor any opportunity to find any provisions therein that support Plaintiffs' fanciful allegations. There is no reasonable likelihood of Plaintiffs prevailing in their adversary action.

**B. Plaintiffs Fail to Demonstrate Irreparable Harm.**

Plaintiffs do not meet the requisite showing of irreparable harm if Old Canal is allowed to proceed with a foreclosure on the Trust Deed. A preliminary injunction may be granted when it appears that the continuance of some act during the litigation would produce waste or irreparable injury to a party in the action. California Code of Civil Procedure, Section 526(a)(2).

Irreparable injury relates to damages estimable only by conjecture and not by any accurate standard. Gow v. Mitchell Brothers' Santa Ana Theater 118 Cal.App.3d 863, 870-871, 173 Cal.Rptr. 476 (1981). Damage is not irreparable if it can be adequately compensated by an award of monetary damages.

Whether the damage and injury inflicted is irreparable and entitles the applicant to injunctive relief is so intimately bound up with the question of the availability of an adequate remedy at law that the two may well be considered together. People v. Monterey Fish Products Co. 195 Cal. 548, 564, 234 P. 398 (1925).

Plaintiffs do not show why monetary damages could not compensate them for any alleged wrongdoings by Defendants. Plaintiffs could have paid off the Note and easily sought monetary damages. Defendant Old Canal was granted relief from the Automatic Stay on February 22, 2006. The instant application for a preliminary injunction does not meet the standards of showing irreparable harm to Plaintiffs.

The Court must consider the inadequacy of other remedies, the degree of irreparable harm and the necessity of preserving the status quo. 14859 Moorpark Homeowner's Assn. V. VRT 63 Cal.App. 4th 1396, 74 Cal. Rptr. 2d 712 (1998). However, proof of irreparable injury by Plaintiffs is a necessary element in allowing a preliminary injunction to issue. Loder v.

City of Glendale 216 Cal.App.3d 777, 782-783, 265 Cal.Rptr. 66 (1989).

Before a court can exercise its discretion to grant preliminary injunction, applicant is required to make prima facie showing of entitlement to injunctive relief and to demonstrate real threat of immediate and irreparable injury due to inadequacy of legal remedies. Triple A Machine Shop, Inc. v. State of California 213 Cal.App.3d 131, 138, 261 Cal.Rptr. 493 (1989).

Plaintiffs have failed to provide the requisite evidence to support a claim of irreparable injury.

## C. Application of the Doctrine of Laches Mandates Denial of Preliminary Injunction.

The equitable defense of "laches" may be asserted in a suit or application for an injunction. [Vesper v. Forest Lawn Cemetery Assn. 20 Cal. App. 2d157, 165, 67 P.2d 3681 (1937)] by showing unreasonable delay in bringing the action and prejudice to the responding party from the delay [Finnie v. Town of Tiburon 199 Cal.App.3d 1, 14, 244 Cal.Rptr. 581 (1988)]. Whether delay amounts to "laches" is measured in each case by equitable considerations. California Western School of Law v. California Western University 125 Cal.App. 3d 1002, 1007, 178 Cal.Rptr. 685 (1981).

The Court should consider the factual background set forth in the Complaint and why Plaintiffs are now seeking a preliminary injunction.

The following are some factors courts weight in deciding whether to deny an injunction on the basis of "laches". California Western School of Law v. California Western University 125 Cal.App. 3d 1002, 1007, 178 Cal.Rptr. 685 (1981); Tustin Community Hospital, Inc. v. Santa Ana Community Hospital Assn. 89 Cal. App. 3d 889, 905, 153 Cal.Rptr. 76 (1979).

- The length of the delay.
- Excuses for the delay
- Responding party's knowledge of the harm to applicant.
- Moving party's acquiescence or consent, or the appearance of acquiescence or consent, regarding responding party's conduct.
- Prejudice to, or reliance by, the responding party

In this case Plaintiffs have offered no excuses for the lengthy delay in initiating this adversary action and seeking a preliminary injunction. From and after **May 14, 2004,** Plaintiffs could have sought to cancel the Note. Plaintiffs should not have waited for the eve of foreclosure to file the instant bankruptcy proceeding and the underlying adversary action. Indeed, at any point in time between **May 14, 2002 through the date of Plaintiffs' bankruptcy filing, August 22, 2005,** Plaintiffs could have sought their desired relief. There are no excuses for the delay and Plaintiffs clearly knew what they signed and how JVP and ultimately Old Canal would rely on the validity of the Note and Trust Deed obligations. Prejudice, if any, will be suffered by Defendants not the Plaintiffs if the preliminary injunction is granted.

Holt v. County of Monterey 128 Cl.App.3d 797, 801, 180 Cal. Rptr. 514 (1982) is instructive. Injunctive relief was denied when the moving party knew of a proposed condominium construction plan two and one-half years before the filing of a suit to stop the project. See also Finnie v. Town of Tiburon 199 Cal.App.3d 1, 14, 244 Cal.Rptr. 581 (1988). Where an injunction was denied because the Plaintiff waited three months after learning of a proposed municipal election and filed its lawsuit only two weeks before the scheduled election. Similarly, Plaintiffs should have sought injunctive relief long before the filing this adversary action.

**D. Applicaton of the Doctrine of Unclean Hands Requires Denial of Preliminary Injunction.**

A responding party may challenge an action for an injunction by claiming that the applicant does not have "clean hands". London v. Marco 103 Cal.App.2d 450, 453, 229 P.2d 401 (1951). The inequitable conduct charged must pertain to the subject matter involved in the action . Nutro Products, Inc. v. Cole Grain Co. 3 Cal.App.4th 860, 869, 5 Cal.Rptr.2d 41 (1992).

If Plaintiffs are guilty of "unclean hands' and their conduct directly relates to the merits of the controversy, injunctive relief should be denied. Euddruckers, Inc. v. Doc's B.R. Others, Inc. 826 F.2d 837, 847 (9th Cir. 1987).

Because injunctive relief is equitable, "a court will take account of the possible existence of certain defenses that historically have been available in equity even though the applicant has presented a seemingly meritorious claim for an injunction" Wright & Miller Federal Practice and Procedure, Civil §2946,At 411. The question is "whether plaintiff's activity transgresses general equitable standards of conduct." Id. At 413 n7

> "n7 The applicable maxim is that he who comes into equity must enter with clean hands" (emphasis added).

Plaintiffs come into this court with hands that are **severely "soiled".** In essence Plaintiffs admit that they purposefully and intentionally sought to defraud their creditors by executing a "bogus" Note and Trust Deed. While defendants strenuously object to the blatantly false allegations that Shiverdaker and JVP were part of that apparent scheme, Plaintiff want this Court to believe that their actions should be rewarded with "equitable" relief.

It is patently clear that Plaintiffs solely conceived this Note and Trust Deed conspiracy concept. What would JVP and Shiverdaker gain in being a party to such a fraudulent plan? There is absolutely no reason why Defendants would be willing to participate in such a

scheme.

Application of the doctrine of "unclean hands" mandates denial of the equitable relief sought by Plaintiffs.

The Court should also note that Defendant Old Canal is truly a bona fide purchaser for value. When it purchased the subject Note and Trust Deed from Shiverdaker, Old Canal was in no fashion connected to the outrageously unsupported claims that the Note and Trust Deed were wor

**E. Changed Circumstances Regarding Property Values Require Denial of Preliminary Injunction.**

William Ames offers evidence that the amount of liens against the Plaintiffs' real Property total approximately "$1,480,553.00" and that an appraisal supports a value of the Property at "$1,375,000.00".

This Court may take judicial notice of the fact that California real estate values are declining and will continue to decline in the near future.

Old Canal's Note and Trust Deed position is arguably already damaged and will continue to be damaged by any further delay in completing a foreclosure. If Old Canal is to recoup any of the funds secured by the Trust Deed it must do so immediately.

Old Canal is not being afforded any adequate protection and indeed the status quo would not be maintained by the imposition of a preliminary injunction. As the potential equity is erodes further, Old Canal's position is being prejudiced.

**F. Injunctive Relief Requires Adequate Undertaking**

On granting an injunction, the court must require an undertaking on the applicant's part to cover any damages that may be sustained by reason of the injunction if the court ultimately decides that the applicant was not entitled to such relief. The undertaking is

mandatory and a preliminary injunction does not become operative until it is finalized. Casitas Inv. Co. v. Charles Harney, Inc. 203 Cal.App.2d. 811, 816, 21 Cal.Rptr. 821 (1962). See also Federal Rules of Civil Procedure, Section 65(c).

The current payoff on the Note is approximately $740,000.00.

If the Court concludes that an injunction should issue, at the very minimum Plaintiffs should be required to post a bond in an amount not less than $740,000.00 and be required to maintain monthly adequate protection payments equivalent to the contractual interest rate contained in the Note. The required monthly payments during the pendency of this adversary action should be at least $3,703.33 per month (calculated at an interest rate of 6% on principal balance of $740,000.00).

## CONCLUSION

It is well established that the burden of persuasion rests with the party seeking preliminary injunctive relief. West Point-Pepperall v. Donovan 689 F.2d 950, 956 (11th Cir. 1982).

Plaintiffs only offer a verified Complaint. Defendants' verified Answer, this Opposition Memorandum and the attached Declaration of Shiverdaker clearly provide sufficient basis for denial of the requested relief. Plaintiffs cannot meet their burden.

Based upon the foregoing, the verified Answer of Defendants and the attached Declarations of Shiverdaker and of Michael S. Polk, Defendants respectfully urge that

[this space left intentionally blank]

Plaintiffs' application for a preliminary injunction be summarily denied.

Dated: March 23, 2006

POLK, PROBER & RAPHAEL, A LAW CORPORATION

By ___/s/ Michael S. Polk
MICHAEL S. POLK
Attorneys for Defendants JAY DEE SHIVERDAKER,
JOINT VENTURE PARTNERS INTERNATIONAL, INC., OLD CANAL FINANCIAL CORPORATION AND GLOBAL FORECLOSURE CORPORATION